Domenick L. Gabrielli, J.
The plaintiffs have brought suit as taxpayers of the West Irondequoit School District, and as parents of pupils attending this school, to permanently enjoin the defendants from executing a plan whereby 25 first grade ||pupils from racially and culturally imbalanced districts within ■the City of Rochester will be transferred to the West Irondequoit School, for the academic year 1965-1966. The West Irondequoit School is outside of but contiguous to the Rochester City School District. " ~
The plaintiffs now seek an order granting a preliminary injunction to restrain the President, Superintendent of Schools, and Boards of Education of these two school districts from implementing any such plan until the final determination of the action.
In a directive to all local school boards in the State, the Commissioner of Education requested the school districts to determine the status of racial imbalance in their schools and, if such existed, to formulate and submit plans to correct it. ¡Following this, the West Irondequoit School Board found that a condition of racial imbalance did exist in the school district, there being but 4 Negro pupils in a total enrollment 5,800 pupils in its schools.
Thereafter and after a series of meetings had and studies made, this board adopted a resolution on March 23, 1965 by which the board resolved to initiate a program which would permit the “ West Irondequoit .School District to serve as a receiving school for pupils currently enrolled in racially and culturally imbalanced schools in Rochester.” Arrangements were then formulated with the Rochester 'City School District to put the plan into effect, which were crystallized in the resolution of June 28,1965 entitled, “ A Policy for Educational Enrichment in Intercultural Relations.” The program was, as stated by the defendant receiving board, designed to “ have present in a single school, children from varied racial, cultural, socio-economic and religious backgrounds”, and that this would be an “ important element in the preparation for young people for active participation in the social and political affairs of our democracy.” The plan will not be limited to Negro children. ——
In his notification to the local boards throughout the State, the Commissioner of Education called attention to the statement *475 of policy adopted by the State Board of Regents that: “ The State of New York has" loñ|fYleId“the principle that equal opportunity for all children, without regard to differences in economic, national, religious or racial background, is a manifestation of the vitality of our American democratic society and is essential to its continuation. This fundamental educational principle has long since been written into Education law and policy. Subsequent events have repeatedly given it moral re-affirmation. Nevertheless, all citizens have the responsibility to re-examine the schools within their local systems in order to determine whether they conform to this standard so clearly seen to be the right of every child.”
The plan under attack proposes the transfer of these pupils at no expense to the receiving school and further that they will be tuition paying students. It would be well to here point out that there will be no compulsion on the part of any of the pupils to be transferred and, in addition to the plan being a voluntary one, the requests for this will come from the parents of these pupils.
Subdivision 2 of section 3202 of the Education Law provides that: “ Nonresidents of a district, if otherwise competent, may be admitted into the school or schools of a district or city, upon the consent of the trustees or the board of education, upon terms prescribed by such trustees or board.”
It is, therefore, clear that the authority provided by this provision, as well as section 2045 of the Education Law, permits the receving board to accept nonresident pupils. The plaintiffs, upon the argument of this motion, recognized that the board has such authority. However, the gravamen of their complaint in the present proceeding is that the actions of the boards were both discriminatory and unconstitutional, as being violative of the State and Federal Constitutions and, therefore, outside the pale of the authority granted by these sections.
The plaintiffs further claim that the actions of the Commissioner and those connected with this plan were arbitrary and capricious. This court is not unmindful of the fact that determinations made by the Board of Regents, the Commissioner of Education and local boards in these areas of education can and often do create strong feelings among those locally involved. Entwined in this, of course, in the very nature of our system of Government, is the right of free expression as to the manner in which it is being operated. The law, as created and defined by the State Legislature, spells out the rights and limitations of its various branches of Government. Pursuant *476 ’'to the enactment of section 207 of the Education Law, the Legislature authorized the Board of Regents to make certain declarations of policy, one of which was that racially imbalanced schools are educationally inadequate. By this section, the Legislature has endowed the Board of Regents and the Commissioner of Education with the right to formulate public policy and to make administrative decisions in the field of education; and our highest courts have said that, because of this, the courts are devoid of power to evaluate the sociological, psychological and educational assumptions relied upon by the Commissioner. (Matter of Vetere v. Mitchell, 21 A D 2d 561, affd. sub nom. Matter of Vetere v. Allen, 15 N Y 2d 259.)
Having determined the right of the Board of Regents and the Commissioner to establish such a policy, I' turn to the legality of the directive of the Commissioner to all local school boards to put into effect the plans for correcting any racial imbalance. Sections 301 and 305 of the Education Law give the Commissioner the authority to implement the policy established by the Board of Regents and he, therefore, was authorized to direct the local boards to take steps to eliminate racial imbalance. In discussing this feature, our highest court (Matter of Vetere v. Allen, supra, p. 267), in stating that disagreement with the Commissioner’s right to adopt certain sociological and educational assumptions cannot be reviewed by the courts further said: ‘ ‘ Such arguments can only be heard in the Legislature which has endowed the Commissioner with an all but absolute power, or by the Board of Regents, who are elected by the Legislature and make public policy in the field of education.” There can, therefore, be no foundation to any argument that the action of the Commissioner was either arbitrary or capricious, as these terms are defined by law.
Our next consideration is directed to actions of the defendants. In following the directive of the Commissioner and, in the anticipated execution of the plan as adopted, have they performed unlawful or unconstitutional acts which justify the issuance of a preliminary injunction?
The court has no inherent power to grant a preliminary injunction (Bachman v. Harrington, 184 N. Y. 458) and the authority therefor must be found in the Civil Practice Law and Rules, the applicable provisions of which must be fully complied with. (Kleinman v. Kleinman, 283 App. Div. 1063.) These provisions as set forth in article 63 of the Civil Practice Law and Rules, among other requirements, mandate that in *477 an action for an injunction, in order to obtain the requested relief in advance of trial, the plaintiffs show a clear legal right thereto, as well as a firm showing of irreparable injury to the movants. (De Candido v. Young Stars, 10 A D 2d 922.)
It has long been the rule that the burden of establishing the right to the drastic relief of a preliminary injunction is upon the moving party or parties. (Park Terrace Caterers v. McDonough, 9 A D 2d 113; Pine Hill-Kingston Bus Corp. v. Davis, 225 App. Div. 182; Maxwell Co. v. Cusack Co., 200 App. Div. 610.)
Because of these requirements, reference will be made to the merits of the plaintiffs’ cause of action as described in the complaint. In approaching the question whether the plaintiffs have shown a “ clear legal right” to the requested relief, we must be mindful of previous pronouncements of the courts in this area of education. It must be pointed out that the plan under attack does not compel any transfer of pupils. As in Matter of Di Sano v. Storandt (22 A D 2d 6, 9) transfer is here provided wholly and solely on a voluntary basis. The court thus held that any conclusion that the plan is discriminatory “ loses its validity.” (See, also, Matter of Van Blerkom v. Donovan, 22 A D 2d 71.)
Is there any constitutional or other prohibition to correct any racial, economic or social imbalance? The question has already been answered in the negative on several occasions. Where a school board adopted a plan which zoned the school district so that it would be approximately % Negro, % white and % Puerto Rican, the court in Matter of Balaban v. Rubin (14 N Y 2d 193), held that it did not violate the Education Law or any constitutional prohibitions. Addressing the same issue, the court, in Matter of Strippoli v. Bickal (21 A D 2d 365, 368), stated: “The only question before us is whether, by means of a plan of action which is otherwise reasonable and lawful, the schools may also attempt to correct racial imbalance and this issue has already been resolved by our highest court (Matter of Balaban v. Rubin, supra).” As to whether the addition of racial and sociological considerations to its decision created a prohibitory act, the same court held (pp. 367-368) that “ a determination of the Board of Education which is otherwise lawful and reasonable does not become unlawful merely because the factor of racial balance is accorded relevance.” Here, as in Strippoli, the action to be taken is legal in that the law authorizes the receiving board to accept pupils from other school districts. (Education Law, § 3202, subd. 2.)
*478 In effect, this court is being asked to make a finding that the correction of any racial or cultural imbalance, by the plan adopted, is contrary to law and unconstitutional. Regarding the stated policy of the Board of Regents and the Commissioner of Education, an examination of the Education Law (§§ 207, 301, 305) shows that the declaration of the policy was neither arbitrary nor capricious; neither was the action by these defendants in the implementation thereof. The court is not permitted to substitute some other judgment for the judgment they assumed; that is, that correction of racial imbalance is an educational aid to both the minority group and the pupils in the receiving schools; and that compulsory education should be designed for the greatest good of all. This latter principle as declared in Matter of Vetere v. Mitchell (21 A D 2d 561, 564, supra) was affirmed by our highest court (15 N Y 2d 259).
Because these principles have been declared pursuant to authority contained in the enactments of the Legislature (Education Law, §§ 207, 301, 305), any legal alteration of policy or philosophy of education can, therefore, be accomplished only by the Legislature.
To grant this application for a preliminary injunction under the attendant circumstances herein described, would not only be legally impossible, inappropriate and an abuse of discretion, hut there is no “clear showing” of any legal justification or authority for the relief presently sought.
Motion denied, without costs.