Domenick L. Gabbrielli, J.
The plaintiffs, as parents and taxpayers in the West Irondeqnoit School District, seek judgment to permanently enjoin the defendants from executing a plan whereby certain first grade pupils from culturally and racially imbalanced school districts in the City of Rochester are transferred to the West Irondequoit School. The West Irondequoit School District is outside the City of Rochester, but it has a common boundary with the city school district.
Dismissal of the plaintiffs’ complaint is sought by a motion directed to the complaint on the part of the Rochester City School Board, and by way of an order for summary judgment on the part of the West Irondequoit School Board.
Following a series of studies, the West Irondequoit School Board adopted a policy entitled ‘ ‘ Educational Enrichment in Inter-Cultural Relations. ” It appears that this policy had a threefold purpose for (a) encouraging programs of exchange visits with pupils of the Rochester public schools in areas of mutual interest, (b) an addition to the ■ curriculum and plan of education of the children in the receiving school with emphasis *935 on and regard to the background and contributions to American culture of various minority groups, and (c) that the receiving school accept pupils from the city school districts, to the extent that space permitted, upon the payment of tuition fees. In furtherance of this policy and following certain negotiations, the two Boards of Education evolved a plan of transfer of pupils from the city school district to the suburban school district, on a limited basis.
It further appears uncontradicted that of a total enrollment of 5,800, there were 4 non-white pupils attending the West Irondequoit schools. The plan of transfer and acceptance was not limited to Negro pupils, but would extend to the culturally and financially underprivileged of all races and color. One of the theories of the plan is that it would materially aid both the students being transferred, as well as those in the receiving school. In effect, one of the desired aims was to curtail a policy of insulation and permit an interchange of ideas and cultural backgrounds. The plan, as stated by the defendant receiving board, was designed to “have present in a single school, children from varied racial, cultural, socio-economic and religious backgrounds ”, which would be an “ important element in the preparation for young people for active participation in the social and political affairs of our democracy. ”
The plan was put into effect after appropriate action and approval by the Rochester City School Board of Education and was inaugurated by the transfer of 25 first grade pupils to the receiving school.
The plan under attack creates no compulsion on the part of the pupils to be transferred and, in addition to the plan of transfer being on a voluntary basis, the requests for transfer come from the parents of these pupils.
It further appears that the transfers take place at no expense to the receiving school.
Sections 1709 (subd. 13), 2041, 2045 and 3202 (subd. 2) of the Education Law form the basis for the action taken. Subdivision 2 of section 3202 of the Education Law provides that:11 Nonresidents of a district, if otherwise competent, may be admitted into the school or schools of a district or city, upon the consent of the trustees or the board of education, upon terms prescribed by such trustees or board”, and thus clearly authorizes the receiving school to accept nonresident pupils. With the provisions of this section, the plaintiffs have no quarrel, and they recognize that the board possesses the requisite authority, but they seek relief on the grounds that the action taken was unconstitutional, capricious and discriminatory.
*936 The events leading to the adoption of the mutual plan now being attacked stem from a directive to all local school boards in the State, from the Commissioner of Education. This requested the boards to determine the status of any imbalance in the schools and urged them to formulate plans to correct any situations so found. In his message to the local boards, the State Commissioner of Education called attention to the statement of policy adopted by the State Board of Regents that: ‘ll The State of New York has long held the principle that equal opportunity for all children, without regard to differences in economic, national, religious or racial background, is a manifestation of the vitality of our American democratic society and is essential to its continuation. This fundamental educational principle has long since been written into Education law and policy. Subsequent events have repeatedly given it moral re-affirmation. Nevertheless, all citizens have the responsibility to re-examine the schools within their local systems in order to determine whether they conform to this standard so clearly seen to be the right of every child. ”
Experience has shown that matters of this kind when aired and locally debated often do, and have in this instance, created strong feelings among those directly involved. Inherent in the very nature of our system of government is the right of free debate and expression as to the manner in which any branch of our government is being operated, including any policies adopted. The present controversy is no exception to the, rule that firm expressions of opinion have been voiced. However volatile any discussions may be, it is axiomatic that a determination of any such controversy must be based solely on the legal rights and privileges of all involved, and particularly the children to be educated, whose rights to equal opportunity in our system of compulsory education, must be maintained.
The State 'Constitution and legislative enactments have defined the rights, duties and limitations of the various branches- of our government. One of these is section 207 of the Education Law, by which the Legislature authorized the Board of Regents to make certain declarations of policy. One of these is that racially imbalanced schools are educationally inadequate. This court has previously had occasion to observe (47 Misc 2d 473) that “ By this section [Education Law, § 207], the Legislature has endowed the Board of Regents and the Commissioner of Education with the right to formulate public policy and to make administrative decisions in the field of education; and our highest courts have said that, because of this, the courts are devoid of power to evaluate the sociological, psychological and *937 educational assumptions relied upon by the Commissioner. ” (See, also, Matter of Vetere v. Mitchell, 21 A D 2d 561, affd. sub nom. Matter of Vetere v. Allen, 15 N Y 2d 259.)
In a search for the answer as to whether the complaint states a cause of action or whether there are any triable issues, we must determine whether the actions of the defendants were violative of the Constitution or any legislative enactment.
The question as to whether an attempt by a Board of Education to correct any social, economic or racial imbalance is unconstitutional has been answered by our highest court on several occasions. One of the first to reach the Court of Appeals was Matter of Balaban v. Rubin (14 N Y 2d 193, cert. den. 379 U. S. 881) where a school board had adopted a plan which zoned the school district in order that it would be approximately one third white, one third Puerto Rican and one third Negro, and the court there held that the plan neither violated the Constitution nor any of the provisions of the Education Law.
We have already determined that there is legal authority for the defendants to adopt such plans (Education Law, § 1709, subd. 13; §§ 2041, 2045; § 3202, subd. 2), and in such a case it has been held (Matter of Strippoli v. Bickal, 21 A D 2d 365, 368) that where “ by means of a plan of action which is otherwise reasonable and lawful, the schools may also attempt to correct racial imbalance ”. (See, also, Matter of Van Blerkom v. Donovan, 22 A D 2d 71.)
It is well to here emphasize that the plan sought to be enjoined does not compel any transfers of pupils. It is, as was the case in Matter of Di Sano v. Storandt (22 A D 2d 6) being carried out wholly and solely on a voluntary basis and, therefore, any conclusion that the plan is discriminatory “loses its vitality ”.
The actions of these defendants in formulating and executing this plan were neither arbitrary nor capricious, as these terms are defined by law. Courts are not permitted to substitute some other judgment for the judgment adopted by the Boards of Education. Their judgment that a correction of cultural and racial imbalances is an educational aid to both the minority group and to the pupils in the receiving schools, and that compulsory education should be designed for the greatest good of all, must stand. This principle enunciated in Matter of Vetere v. Mitchell (21 A D 2d 561, 564) has been affirmed by our highest court in 15 N Y 2d 259.
The foregoing principles have been declared by the boards under the authority of legislative enactments; and any change of policy or philosophy of education can, therefore, be accomplished only by the Legislature.
*938 An examination of the pleadings and motion papers reveals there are no triable issues of fact, and, that under the circumstances as developed by the pleadings, the motions for summary judgment and for a dismissal of the complaint should be and hereby are granted, without costs. Because of this determination, the application for a protective order made by defendants has become academic.