In the Matter of BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEWBURGH, Appellant, v EWALD B. NYQUIST, as Commissioner of Education of the State of New York, Respondent.

Third Department, July 26, 1979

APPEARANCES OF COUNSEL

*Demov, Morris, Levin & Shein (Joel J. Spector* and *Michael J. De Zorett* of counsel), for appellant.

*Robert D. Stone (Louis H. J. Welch, Jean M. Coon* and *Kenneth Pawson* of counsel), for respondent.

### OPINION OF THE COURT

MAHONEY, P. J.

In this proceeding we review the power of the Board of Regents of the State of New York and, more particularly, the Commissioner of Education to correct *de facto* racial imbalances in local public elementary schools by imposing pupil reassignment. The United States Supreme Court has firmly adhered to the view that only *de jure* segregation, i.e., a current condition of segregation resulting from intentional

State action directed specifically at the segregated schools, is constitutionally impermissible (see *Keyes v School Dist. No. 1, Denver, Col.,* 413 US 189). *De facto,* or adventitious segregation, does not violate the Constitution *(Regents of Univ. of Cal. v Bakke,* 438 US 265, 353, n. 27; *Arlington Hgts. v Metropolitan Housing Corp.,* 429 US 252, 264-265).

Due to a general population shift typical of many northeastern cities, the residential population in the vicinity of the downtown business district on the east side of Newburgh has become progressively more nonwhite. Consequently, several schools located in these neighborhoods have developed an inordinately high ratio of nonwhite to white students. Steps to correct this racial imbalance were begun in 1963, but, due to intervening administrative delays and legal proceedings, progress has been erratic. Nonetheless, by 1972, the city school board had made substantial progress toward the goal of racial balance. However, despite a favorable report after an investigation by the State Education Department, the Commissioner of Education directed that the school district, petitioner herein, implement a plan of pupil reassignment.

The proposed plan was designed to reduce the high percentage of minority enrollments in three elementary schools. Broadway School, one of the older schools in the district, and the second most racially isolated in the district with a minority enrollment of 82.2% was to be closed. Students in grades K-5 would be assigned to Chestnut, Meadow Hill and Temple Hill. The latter schools would then have a minority enrollment of less than 33%. Since Broadway School did in fact close in September of 1978, this aspect of the plan presumably has been put into effect.

In the northern part of the district, four schools would be grouped together. Balmville, Fostertown and Gardnertown will serve grades K-4 only. They in turn will feed Montgomery School for grades 5 and 6. Currently, Montgomery School has a minority enrollment of 99.8%, while its immediate and contiguous neighbor, Balmville, has a minority enrollment of only 3.4%. After reorganization, minority enrollment in all four schools will be approximately 40%. A slight overcrowding in the three K-4 schools is expected to be corrected in a year or two because of declining enrollments.

Washington Street School has a minority enrollment of 80.4%. It will be reorganized with two other schools, New

Windsor and Vails Gate. After pupil reassignment, Washington will offer only fifth and sixth grades. Pupils in K-4 will attend either New Windsor or Vails Gate. Washington post-reorganization minority enrollment will drop to 40%. A prospective 12% overutilization of Vails Gate School is expected to be remedied by continuation of a trend of significant lessening enrollment in that attendance area.

Approximately 13% of the total enrollment of the Newburgh City School District will be reassigned. Less than one quarter of elementary school students will be affected, while junior and senior high school students are not involved at all. It is estimated that no student will have to be transported more than 6.5 miles and that the maximum time involved would be one-half hour.

Reassignment would be preceded by a series of orientation meetings on a school-by-school basis. A district curriculum committee would be organized to develop curricula to maximize racial-ethnic understanding and create positive educational experiences for all students. The school district staff would be given additional training to prepare for integration. Finally, a local grievance procedure would be instituted for parents who believe that the rights of their children to health, safety and quality education are jeopardized as a result of their school assignment in accordance with the proposed plan.

Petitioner brought this CPLR article 78 proceeding, alleging that the plan proposed by respondent was, *inter alia,* unnecessary and improper as being based solely on racial considerations. Petitioner also claimed that the plan would impose an impossible financial burden upon the school district and would act to the detriment of the educational quality of the Newburgh public schools. Petitioner also challenged the proposed plan as arbitrary and capricious because respondent failed to consider several adverse consequences of the plan such as overcrowding in certain schools, negative impacts due to busing, etc. Special Term denied petitioner's application because of failure to prove certain asserted adverse consequences. The court refused to entertain argument on the wisdom of respondent's educational policy decisions.

On appeal, petitioner has raised four objections to Special Term's ruling. First, petitioner argues that respondent acted in violation of both Federal and State Constitutions when he ordered pupil reassignment based solely upon racial considerations arising from *de facto* segregation. Petitioner next asserts

that a 1976 amendment to section 310 of the Education Law (L 1976, ch 857) gives the court greater power to review decisions of the commissioner, and that, therefore, the court improperly refused to consider evidence on the merits of busing and other policy questions. Petitioner also contends that respondent's order was in contravention of the avowed policy of the Board of Regents to avoid busing when possible. Finally, petitioner challenges respondent's actions as arbitrary and capricious and an abuse of discretion.

■ Although no constitutional or statutory mandate directs a local school board to promote school integration, there is equally no prohibition against a board's attempt to achieve integration, and the board is free to act in this sphere untrammeled by the courts *(Matter of Van Blerkom v Donovan,* 22 AD2d 71, 72-73, affd 15 NY2d 399). In particular, if a local board of education approved rezoning of attendance areas to correct a racial imbalance, such a purpose would constitute a reasonable basis for its action *(Matter of Balaban v Rubin,* 14 NY2d 193, cert den 379 US 881; see, also, *Matter of Addabbo v Donovan,* 22 AD2d 383, affd 16 NY2d 619, cert den 382 US 905; *Matter of Stripolli v Bickal,* 21 AD2d 365, affd 16 NY2d 652). The Board of Regents and the commissioner may similarly take the initiative and correct racial imbalances without a constitutional and legislative mandate *(Matter of Vetere v Allen,* 15 NY2d 259). Even when, as here, segregation is *de facto,* a rezoning plan to correct racial imbalance is not unconstitutional (see *Lee v Nyquist,* 318 F Supp 710, 719-720, affd 402 US 935; *Power v Monserrat,* 37 AD2d 777; *Udut v Nyquist,* 63 Misc 2d 1066; *Matter of Katalinic v City of Syracuse,* 44 Misc 2d 734).

■ The State Legislature has endowed the Board of Regents and the Commissioner of Education with the right to formulate public policy and to make administrative decisions in the field of education (Education Law, § 207). Because of this, courts are devoid of power to evaluate the sociological, psychological and educational assumptions relied upon by the Commissioner of Education, respondent herein *(Matter of Vetere v Mitchell,* 21 AD2d 561, affd *sub nom. Matter of Vetere v Allen,* 15 NY2d 259, *supra; Etter v Littwitz,* 47 Misc 2d 473; see, also, *Etter v Littwitz,* 49 Misc 2d 934, affd 28 AD2d 825). Notwithstanding a 1976 amendment to section 310 of the Education Law that expanded judicial authority to test decisions by the commissioner in full article 78 review (L 1976, ch

857; see NY Legis Ann, 1976, p 407; *Matter of Chauvel v Nyquist,* 43 NY2d 48, 52), the merits of the educational assumptions relied upon by the respondent are still an exercise in professional judgment and, as such, are beyond the purview of the courts *(James v Board of Educ.,* 42 NY2d 357, 367-368; cf. *Matter of Bokhair v Board of Educ.,* 43 NY2d 855, 856; *Donohue v Copiague Union Free School Dist.,* 64 AD2d 29, 37). Therefore, Special Term properly refrained from ruling on the wisdom of policy judgments made by the commissioner.

■ Petitioner's assertion that the commissioner has incorrectly determined that segregation or racial imbalance has continued in its elementary schools is refuted by its vehement assertions elsewhere in its petition that it has done an adequate job of integrating the schools on its own. Furthermore, the Board of Regents has defined an integrated school as one in which the racial composition of the student body reflects the pupil population of the school district without necessarily attempting to be proportional to it, and in which the program, facilities and equipment are not racially identifiable. Petitioner correctly states that the ratio of minority students to school population alone cannot support a finding of racial imbalance. In addition, there must be at least some analysis of total district figures on minority enrollment. However, it is clear that the pupil populations in Montgomery School (99.8% minority enrollment) and Washington Street School (80.4% minority enrollment) differ so markedly from the total school district population of approximately 40% nonwhite enrollment that the commissioner's finding of racial imbalance is reasonable.

■■ The reassignment plan proposed by the commissioner is consistent with Board of Regents' policy. The Regents' Statement on Racial Integration, released February 20, 1975, set forth several methods to remedy racial imbalances including, where feasible, strategic location of new schools or closing of unneeded schools or both, optional transfer programs and open enrollments, expansion of magnet and specialized schools, compensatory education programs, curricula which enhance interracial understanding, recruitment of qualified faculty from varied racial and ethnic backgrounds, equalization of State aid to school districts, alteration of school attendance zones where necessary, and, in some instances, the judicious and reasonable transportation of pupils with due

consideration that the health, safety and access to high quality education of pupils are not imperiled and with particular consideration that children of elementary school age are not transported more than moderate distances. The precise methods chosen by the commissioner would seem to reflect his professional judgment and, therefore, since this choice pertains to administration and policy matters, this court cannot criticize that decision *(Matter of Vetere v Allen,* 15 NY2d 259, *supra)*. We note in passing that the proposed plan encompasses several of the authorized means, including school closings and curricula design, in addition to pupil reassignment and transportation. The record also suggests that petitioner has already recruited qualified faculty from varied racial and ethnic backgrounds, and that construction of new schools is not needed in the district.

■ Of course, if the proposed reassignment required excessive busing and/or jeopardized the safety of students, it would be in contravention of the Board of Regents' policy. The proposed reassignment plan does not mandate busing. However, due to the reassignment, many elementary school pupils will require transportation to their new schools. The record does not indicate exactly how many of these students are currently being bused. The commissioner estimated that less than half of the affected students will be required to rely upon transportation due to the reassignment and forecast an increase of only 8.7% in the transportation requirements of the district. Petitioner argued that substantial additions to its transportation capabilities will be required because of new ridership and longer distances and times of bus runs. But the petitioner did not produce any alternate estimates on the number of new riders, and the proposed plan seems consistent with the Board of Regents' directive of "judicious and reasonable transportation."

In addition, we note that whereas many minority students will be reassigned out of their neighborhood for grades K-4, they will be returning to their neighborhood for fifth and sixth grades. Correspondingly, the suburban students, predominantly white, will be attending more local schools until fifth and sixth grades when they will require transportation. Also, most junior high school students in the district are assigned to either North Junior or South Junior. These schools are located between the K-4 schools, now predominantly away from the inner City of Newburgh, and two large fifth and sixth

grade schools, i.e., Montgomery and Washington Street, located in an urban setting. The proposed reassignment and realignment of elementary schools fits in with the assignment of junior high students, and has the further advantage of using transportation to expose maturing students to different backgrounds within the city they call home.

Petitioner has failed to establish on the record that the proposed transportation presents significant safety hazards to the elementary school children involved. Indeed, petitioner's proof on obstacles to safely walking to new schools suggested that transporting students by bus would be safer.

■ ■ The proposed plan is, therefore, constitutional and within the integration policies enunciated by the Board of Regents. All that remains is to determine whether the plan is reasonable within the standard of article 78 review on questions of arbitrariness and capriciousness (see *Matter of Pell v Board of Educ.,* 34 NY2d 222, 231). Certainly, a financially disruptive plan would be pure arbitrariness *(Matter of Board of Educ. v Allen,* 32 AD2d 985). The commissioner estimated the total cost for transportation necessitated by reassignment would be $120,000, and most of this amount would be subject to 90% State reimbursement. The commissioner also suggested that additional funding might be available through the Emergency School Aid Act and title IV of the Civil Rights Act of 1964 (US Code, tit 42, § 2000c *et seq.),* and through the Division of Intercultural Relations in Education. (US Code, tit 20, § 1601 *et seq.)*

Petitioner estimated that a total expense of $1.7 million would be incurred. This cost included $456,000 for direct transportation costs, $896,490 for required remedial reading programs, $20,000 for building alterations, $306,250 for the required orientation program, and $40,000 for the grievance procedure. Included within petitioner's estimated transportation costs were funding for bus monitors, allegedly required because of the increased time spent on the bus, the purchase of 13 new buses, and other expenses. But much of petitioner's cost estimate is based on assumptions as to new services that would be required, and this type of evidence cannot be accepted by the courts (see *Matter of Board of Educ. v Allen,* 64 Misc 2d 379). Petitioner's witness stated that the cost of additional equipment with extra runs required on some buses would be approximately $331,000. In light of the $25 million school budget for 1975-1976, and despite evidence of the fiscal

restraints imposed upon petitioner due to local economic conditions, we agree with Special Term that petitioner has failed to establish that implementation of the proposed plan would be financially impossible.

Finally, the commissioner's order is not arbitrary and capricious because it represents an attempt to correct racial imbalances in local public schools *(Matter of Vetere v Mitchell,* 15 NY2d 259, *supra; Matter of Katalinic v City of Syracuse,* 44 Misc 2d 734, *supra).* Perhaps respondent commissioner could have been more expansive in outlining the factors he used to decide that the proposed reassignment plan was required, but in view of our limited scope of review, upon the record before us, we cannot find his decision arbitrary and capricious.

The judgment should be affirmed, without costs.

GREENBLOTT, KANE and MIKOLL, JJ., concur; MAIN, J., not taking part.

Judgment affirmed, without costs.